We will hear argument this morning in Case 23-900, Dewberry Group v. Dewberry Engineers. Mr. Hungar? Thank you, Mr. Chief Justice, and may it please the Court. The Lanham Act authorizes disgorgement of the defendant's profits. Petitioner is the only defendant in this case, but it had no profits to disgorge. So the courts below ordered Petitioner to disgorge the profits of its legally distinct affiliates to the tune of $43 million. Nothing in the Lanham Act authorizes that blatant disregard of corporate separateness. Under the Act's plain language, a defendant's profits do not include the profits of separate corporations. A respondent asserted a, quote, collective economic enterprise, close quote, theory, persuading the courts below to treat Petitioner and its affiliates as a single corporate entity so as to attribute the affiliates' profits to Petitioner. That's classic disregard of the corporate form, yet both respondent and the courts below disavowed any claim of veil-piercing. Instead, the Fourth Circuit relied on its notion of equity to justify the single corporate entity approach. But that assertion of unbounded equitable authority violates the maxim that equity follows the law, including the best foods presumption of corporate separateness. It also contradicts the equitable principles that disgorgement is limited to the defendant's profits, not those of affiliates, and does not allow penalties like the award here. For precisely those same reasons, respondent fails in its attempt to justify the award by distorting the just sum provision. Starbucks held that the word just in a remedial statute incorporates traditional equitable limits. So rejection of the Fourth Circuit's rationale, as contrary to equitable principles and the best foods presumption, necessarily leads to rejection of respondent's just sum argument as well. Courts don't respect corporate separateness by treating the rental profits received by separate corporations from their own properties as if they belonged to the defendant. The disgorgement award is unlawful under the Lanham Act and should be reversed outright. I welcome the court's questions. These separate corporations have the same owner, right? Correct. Would it make any difference to your argument, or what would your argument be if this were in a partnership form? Well, so in the Liu case, which recognized many of the principles that we're advocating here today, the court said that partnership is an accepted basis for joint and several liability, even in the disgorgement context. But there's no proof or allegation here of partnership, and that theory was not. So your argument basically relies on, it's more of a formalistic argument, relies on the fact that these businesses that are owned by one person are in a separate corporate form, as opposed to partnership or sole proprietorship. Correct. And that is the fundamental principle of corporate separateness that this court has recognized in numerous cases. The Dole Foods case we cited in our brief, the Best Foods case itself, because of a long tradition of history and reliance to the tune of billions, if not trillions of dollars, in corporate America relying on the principle of corporate separateness and its recognition by the courts. The court said in Best Foods that unless Congress directly says otherwise, corporate separateness is the norm, unless you can prove the normal grounds for disregarding separate corporations, which Respondent disavowed doing here. Well, I think the courts below thought that this looked, if you got past the form, again, there's a comparison between partnership and corporate form, but it seemed as though the court was saying, look, this is one business, and we'll treat it as one business, and we'll ignore the corporate form of separate businesses owned by the same person. Your Honor, there are recognized principles and rules that govern the circumstances in which the corporate form will be disregarded, and Respondent and the courts below expressly disavowed any reliance on those accepted principles. At trial, the Respondent's expert who theorized, who had presented this single economic enterprise theory was asked, you're not alleging that there's some sort of abuse of the corporate form or fraud or anything? Answer, no. That's it, Joint Appendix 67. The District Court made clear plaintiffs did not allege alter ego liability, and so that's of no moment. That's at 86A of the Petition Appendix. The Court of Appeals said rather than pierce the corporate veil, the District Court adopted its single economic enterprise theory at Petition Appendix 43A. Even Petitioner admits in its merits brief that it did not pierce the corporate veil and disclaimed doing so. So there's no dispute that the judgment does not rest on any accepted notion of piercing the corporate veil. Instead, the court simply disregarded corporate entities because they're commonly owned. But as this court said in Dole Food, the fact that multiple affiliated corporations are commonly owned does not mean that one corporation owns the property of the other corporation, and the same is true here. Mr. Hungard, does the fact that we have separate entities necessarily mean that the court can't consider the non-defendant affiliates' profits? I mean, I take your point that the Lanham Act does not allow for disgorgement of these separate entities' profits, but I would wonder whether or not the question really is how do you go about calculating the defendant's profits in this sort of unique financial circumstance, and does that necessarily mean that the court couldn't look at the profits of the other entities to assess defendants' profits as evidence, for example, under certain circumstances? Well, there could be circumstances in which that would be permissible. For instance, the briefs talk about the Sheldon case from the Second Circuit, where the court held that because the defendant in that case was the parent corporation, it owned stock in the subsidiaries that had engaged in infringement and had profited from it. And the court said it was not attributing the subsidiaries' profits, but it said the parent, because of its ownership of stock, had a financial benefit, a financial gain to itself that it owned because the stock was worth more. It could sell it for more money because of the profits held by the subsidiaries. So you're not saying that the defendant's own books are the only piece of evidence that can be considered by the court? No, exactly right. And equity is clear that you can look beyond the defendant's books to get at the reality, but the key is it has to benefit profits owned by the defendant, even if not recorded on his books, not profits owned by a separate corporation. So what is your response to the solicitor general's proposed profit calculation here that has to do with the alleged undercounting of the fees and whether or not that can be looked at or taken into account? So threefold. First of all, that argument is forfeited in this case. It's not presented, which I would like to get back to in greater detail. But second of all, if you're talking about reallocating the fees, basically, to pretend as if Petitioner had received more fees because supposedly it was charging below-cost fees, as a legal matter, that would not be, in our view, an accepted basis at equity, because, again, equity looks only to the gain actually received by the defendant in this court's cases that we've cited, and I'll say that over and over again. In this scenario, the government is essentially admitting these are revenues that weren't received, actually, by the defendant. They were received by the other affiliates, but we're just going to essentially treat the defendant as if it had received those additional revenues because we think that would be more in keeping with economic reality. This makes no sense to me. Counselor, the government points to an issue of assignment of revenue. If you have a situation like this one, where someone is rendering services at a loss and the owner of the corporation is making up those losses over time, can't we treat the amount that the owner is putting back into the defendant as profits? So, number one, as I noted in response to Justice Jackson, that argument was never made in this case, and it's not presented, therefore. Counsel, that's an issue of remand. Whether the lower court will permit the trial to be reopened or not, that's always in the discretion of the courts below. This is a case that's putting forth the proper way to evaluate profits, and the court below can decide whether there was an intentional waiver or forfeiture or decide whether to reopen the case. It's not for us. So just assume the theory. I'd like to come back to that, if I may. But with respect to the substance of your question, I think Justice Jackson's question was the government has tried to throw several different theories into this case. No, the government has a very simple theory, as I understood it. Estimate how much they would have received if there had been an arm's-length transaction. What would have been the value of their services? And if they would have received that, that's the profit that they would have made. Well, yes, Your Honor, but there's the alleged below-market-rate expense theory. There's also the assignment theory, which Your Honor, I think, was referring to. Well, the assignment theory, it's only the principles of an assignment theory, which is if I'm making a certain amount of money and I give it to someone else, and here I gave it to the affiliates because their services were worth a lot more money than they were paid. Right. So I have several things to say about the assignment theory. First of all, tax principles do not directly translate into equity. I don't disagree. And so the question would be, is there an equitable theory under which this approach would make sense? And there are certainly inappropriate circumstances there would be, whether it would be a fraudulent conveyance argument or a constructive trust argument, if, in fact, you had a circumstance where the defendant had the right to the income and transferred it to a different party in order to avoid it. When I offer you services below market rate, it means that you're getting a benefit from me. On the below market rate theory, though, again, there are several reasons why that doesn't work. Number one, it's undisputed that the revenues that the government would suggest could be reassigned to petitioner on that theory were actually received by the affiliates, not by the petitioner. But we're not asking for disgorgement here, meaning the court didn't order the affiliates to disgorge anything. They ordered this defendant to pay a certain amount, and that certain amount is what they received or should have received in value for the services they rendered. Right, but the should have received is the problem because this court has said over and over again in the disgorgement context in applying equitable principles, Coop against Royer and the Keystone case and the Livingston case and the rubber company all recognize that the question is the actual profits actually received by the defendant, not possible profits that the defendant could have received if it had structured its business differently, if it had made better deals. Those cases all stand for the proposition that it's actual profits, not possible profits, and that's because of the theory of disgorgement, which is to deny the defendant the benefits it actually received from the wrongful conduct. If it didn't actually receive them, even if it's because it made a bad deal, you don't disgorge those from the defendant. And again, this court has said that over hundreds of years in the equitable context, and the same is true here. The other problem is simply a factual problem. There's no finding and no basis for a finding on this record that the petitioner was actually charging below market rates to the affiliates because it's important to understand the petitioner was also providing substantial services, non-infringing services to its shareholder, to his charitable foundation, to other entities. That's undisputed. The Court of Appeals recognized this at Pet. Act 4A and 45A. The respondent's expert testified to this effect at the trial, that there were substantial non-infringing services to Mr. Dewberry separate and apart from the services being provided to the affiliates. That's at Joint Appendix 142, 193. Respondent made the same argument at 316 and 318 of the Joint Appendix. So it's clear that a substantial amount of the costs incurred by petitioner were not relating to the infringing services allegedly provided to the affiliates, but rather to independent services. So you can't just infer from the fact that they had losses that they were charging below market rates. But, again, the fundamental problem, and if I may, I would like to just point the Court back to the petition. The fundamental problem with all of these arguments, the respondent and the petitioner. Counsel, you've answered my question. I'd like you to finish it. Thank you, yes. In our petition, we made perfectly clear not only that this was a zero profits case, but that that was a particularly good reason why the Court should grant cert in this case because it presented this issue, the legal issue, so nicely and cleanly. So at Petition 5, we said petitioner had zero net profits. At Petition 8, we said as petitioner explained, the record shows that the infringement generated zero profits for petitioner. At Page 10, we said the same thing. At Page 15, we said this case is an ideal vehicle. Why? Petitioner itself obtained zero profits. At Page 35, we said few, if any, cases will likely present the issue so starkly or so cleanly. Petitioner generated zero profits, which eliminates any need to calculate or apportion profits attributable to infringement. And Respondent never disputed those factual assertions in its brief in opposition. Under this Court's Rule 15, those issues are not in the case. There's no need for a remand to address issues that were waived in the brief in opposition. And this Court should enforce its Rule 15 because otherwise you're inviting Respondents and the government to try and throw issues that aren't in the case and distort the question presented. And that is contrary to this Court's rule. I was just going to say, I guess that makes perfect sense to me in the world in which the defendant is the only entity. And when you have a situation in which there's a defendant who is operating at a loss, they make no profit, they may infringe, but under the Lanham Act, only profit is disgorgeable, and there we are. The concern, I think, and maybe this is what motivated the District Court and the lower courts, is that we do have a constellation of entities all owned by the same individual. The others are profiting. So it is just the structure of this financial arrangement that is avoiding the ability for recovery under the Lanham Act. And it seems to me that in a situation like that, that is sort of where equity is supposed to be coming in to ensure that a violation has a remedy. And, you know, Congress uses the term equity, equitable nature of remedy is in this statute. And so I just worry a little bit about allowing for defendants to essentially evade responsibility for infringement by setting up corporate structures such that only the defendant proper is not quote-unquote profiting. So two responses, Your Honor. First of all, it's undisputed, both respondents, experts, and petitioner's witnesses testified that this structure is a common, typical structure in the real estate industry. That's at 46 and 91 of the Joint Appendix. And this long pre-dated the alleged infringement. So there's no claim or evidence that this was somehow set up to evade proper relief. And secondly, equity does provide inappropriate circumstances for remedy for precisely the problem you are addressing. There's piercing the corporate veil, alter ego, agency theory, any number of theories. And you can just sue the additional companies if you think they're involved in the infringement and can prove secondary liability, vicarious liability, or direct liability. So there are all sorts of things that a respondent could have done in order to pursue the other affiliates if they thought it had a basis for doing so. It simply made a tactical decision not to do it, and this Court should not try to fix the respondent's tactical error. Counsel, let's say I have a contract with somebody under which, total stranger, he would pay me $500. But it turns out the services that I provide are actually worth $1,000. He pays the $500. But then a year later, he gives me another $500, looking at the worth of the services and just thinks that that's fair. Now, could a court determine that my gain from that transaction was actually $1,000 rather than just $500? I think it could. I mean, again, if that contact were infringing, the Court could conclude that the defendant's total profits from that infringing conduct was $1,000. I'm not talking about infringement at all. I just mean the concept that you can have profits from a contract even if the compensation exceeds what was required under the contract for a variety of circumstances. Here's a situation that the party considered it was fair. So why can't the Court treat the $23 million of capital, in this case, under the same principles? Well, so as a factual matter, the $23 million is over 30 years. The alleged infringement involves only three years or thereabouts. So if you were going to make that theory, number one, you'd have to look at the relevant years, and number two, Well, it would make a difference if the extra $500 was given over two years, $250 one year and $250 another. But, Your Honor, the capital contributions were being made for 25 or more years before the alleged infringement commenced. You can't say that the capital contributions... In the infringement context, under the Lanham Act, you have to show, if you're trying to attribute revenues to the defendant as, you know, disgorgeable profits, you have to show that they were related to the infringement. So millions of dollars in capital contributed to Petitioner before the infringement commenced can't in any way, shape, or form be suggested to have anything to do with the infringement and therefore would not be included in the calculation. Even with respect to the capital contributions that were made during the infringement period, the plaintiff would have to allege and prove, which they didn't, that those were related to the infringement as opposed to on account of something else, like the fact that Petitioner was providing millions of dollars worth of services to Mr. Dewberry. So again, as a factual matter, Mr. Dewberry was contributing capital and the corporation was providing services to him, separate and apart from, totally unrelated to the alleged infringing activity. So those are all the factual reasons why that theory doesn't work. But yes, as a legal matter, if the plaintiff could prove that the defendant received X dollars in revenues from the infringement directly, but also through some circumlocution and hidden transactions received additional compensation for the infringing conduct, then yes, that could be included in the profits calculation. That would be an appropriate way to make sure that the defendant is disgorging the full measure of its illicit gains. But it has to be from the infringement, not just unrelated revenues. Mr. Hunger, what are we to make of this just sums provision? I mean, assume that you are right in everything you say about what it means to calculate the defendant's profits. This sentence, if the court shall find that the amount of the recovery based on profits is inadequate, the court may in its discretion enter judgment for such sum as the court shall find to be just, I mean, seems to provide a way for a court to say, look, I've done everything by the book in terms of calculating the defendant's profits, and I'm coming up with a number that seems quite unfair in the broader scheme of things, and this sentence gives me a way to move it up, move it down, as you will, with very little in the way of constraint. So that's the way I read this sentence. So I would agree with everything you said except for the last part about very little constraint, and that's because, as this court said in the Starbucks case, when a remedial provision authorizing an equitable remedy gives the court discretion to enter that remedy in a manner that the court deems just, that word incorporates the traditional equitable limitations that go along with that remedy, and here the traditional equitable limitations include you only disgorge the defendant's profits, not the affiliate's profits, only actual profits, not possible profits. You don't award profits when the defendant has zero profits, because that would be a penalty. Well, I guess two things. One is that this idea of fines to be just, you can contrast that in this statute to the earlier language subject to the principles of equity, so they could have just repeated subject to the principles of equity. They really didn't, which suggests to me that this idea of fairness in this latter sentence is a little bit broader than you're saying, that it really does go, you know, I'm not going to stare at old equitable rules. I'm really going to try to figure out whether in arriving at the defendant's profits that really is responsive to the nature of the infringing conduct here. So two responses. Number one, it clearly does not rise to the level of a direct statement abrogating corporate separateness. So however you might interpret this provision with respect to other constraints, the best foods presumption applies to this statute and has not been overridden. So it doesn't justify disregard of corporate separateness, which is precisely what respondents' argument requires if you're going to attribute the profits of affiliates that petitioner did not receive to the petitioner. So that's point one. And point two is the history of this just sum provision goes back to the Copyright Act. And in this court's decision in Brady against Bailey, it construed the just sum provision in that version of the Copyright Act. And it said that this isn't... And the argument there was, well, that allows a penalty because in that case, there was a statutory cap. But the statutory cap, if you went up to it every time, could conceivably be a penalty. And the court said, no, it doesn't allow a penalty. It's intended to achieve full compensation. It's purely compensatory. And therefore, since you're not allowed to go beyond what's purely compensatory, it doesn't impose a penalty. And then 10 years later, Congress added into the Copyright Act, codified the holding of Brady against Bailey by adding the sentence, which also appears in the Lanham Act, about how this shall be compensation and not a penalty or words to that effect. And then again, in the Douglas case, the court again said that this provision in the Copyright Act, the just sum provision, is to be compensatory. So the history is perfectly clear. Every court of appeals that has addressed the question under either the Copyright Act or the Lanham Act has recognized that the just sum of flexibility is cabined by the need for it to be compensatory, not penal.  I mean, there can be circumstances in which that is exactly what the court wants to use this provision for. In other words, like a full measure of compensation would be up here. And the defendant's profits, for whatever reason, are down here. And so we're going to make up the gap. We agree with that. And indeed, again, the legislative history also supports the not a penalty proposition of the Lanham Act. But the interpretation in those cases that I mentioned of the just sum provision was that it's primarily intended to address circumstances where what you can prove as profits or damages under the normal approach is insufficient because of evidentiary weaknesses and the like. It could also address circumstances like the one I was addressing earlier, where the defendant had an unrealized gain. Their stock value, the stock that they owned was worth more. But they hadn't sold it yet. So they had an unrealized gain as a result of the infringement. But it doesn't fit into the statutory profits calculation. Because remember, the Lanham Act says you get defendant's profits. And then it defines them for purposes of the Act as sales minus expenses that are associated with generating the sales. You can have a circumstance where the defendant has itself received and has a right to the profit. But it doesn't fit within sales minus expenses. And a court can use the just sum provision to disgorge that as well. But that has nothing to do with this case because the petitioner did not receive the profits. The affiliates received the profits. And under this court's decision in the Bollinger case and under standard property law, petitioner didn't own those profits. The affiliates own the real estate. They're the lessors. They're entitled legally to the rents under the Bollinger decision. And the fact that a service provider helps a business earn its rents doesn't mean that the service provider is entitled to those rents. Thank you, counsel. Justice Thomas? Justice Alito? Justice Kagan? Justice Gorsuch? Justice Kavanaugh? Yes, I have a question. Your answer to the Chief Justice's question made me think that maybe at least I need a better handle on the scope of profits from the infringement here. You say it has to be from the infringement. So what happened here, and we've sort of skipped right into calculation of damages, but can we back up for a moment? Did the affiliates profit from the infringement? I mean, I know this is against your interests. I'm just trying to understand what profits from the infringement means in this scenario. Well, what the courts of appeals concluded, so the allegation is that Petitioner in marketing and loan applications and so forth used the infringing mark, which was Dewberry Group instead of Dewberry Capital. And therefore, the court treated 80% of the rental revenues received by the affiliates as attributable to the infringement. Presumably, the affiliates were also using the mark in their materials as they vented the property. Petitioner was authorizing leasing agents to use it, if I recall the record correctly, and was itself using the mark. So Petitioner serves under contract as the property management company for the affiliates as a service provider. So as a property management company in dealing with the tenants, it would be using its new name, which the court found to be infringing. So those are the types of uses that the court found to be infringing. And then it said, and because of those uses, we're going to attribute 80% of the rental profits that received by the corporations during the infringement period to Petitioner. I guess I'm just testing your theory that other remedies were available if the plaintiffs in this case had pled this differently. So could they have sued the affiliates for infringement and gotten the disgorgement that the affiliates received? Well, they certainly could have sued them. And they could have alleged alter ego theories or whatever. All the theories that we've talked about. But the defendant and the Petitioner is the infringer from the perspective of this record. Well, again, because they didn't sue any of the other affiliates, they only sued Petitioner. None of this was tested. Presumably, if they had sued them under alter ego or as direct infringers or as secondary infringers or as vicarious infringers, that would have been litigated. And we don't know how that would have resolved. I assume that my client would have resisted those claims. But how it would have come out, we don't know because Respondent never brought those claims. And again, it's not this Court's role, I submit, to try and re-inject into the case new theories that have been forfeited and waived at the petition stage. Thank you. Thank you, Counsel. Mr. Crown? Mr. Chief Justice, and may it please the Court, I'd like to pick up on some of the questions from the bench, which I think gets to the intuition that there are core, longstanding principles here. We see two of them. The first is that courts typically treat corporations as distinct entities. And the second is that a court, when ordering a defendant to relinquish its ill-gotten gains, is not bound by the defendant's self-serving ledgers. Now, we agree that the monetary award in this case is not consistent with the first principle because the courts below treated Petitioner and its affiliates as a single corporate entity and then pooled their combined profits and affirmatively disclaimed relying on bail-piercing principles. For that reason, we think the award should be vacated. But we think the second principle has important things to say about how a court could calculate a defendant's profits while still maintaining corporate separateness without crossing corporate lines. Our brief identified equitable background principles that we think the very purpose of those principles is to address the situation, like we may have here, where a defendant is disguising economic reality in trademark cases. Courts routinely reject deductions where a defendant is attempting to artificially inflate its costs to lower its profits liability. We think the outcome should be no different when a defendant tries to deflate its receipts and income, again, to reduce its profits liability. I welcome the court's questions. You say that you suggest that the defendant is disguising its profits. Is there anything in the record to support that? There is, and I think the problem here is we have closely held affiliates. They're all under common ownership. We look at the rates here. There are 30 years, according to the petitioner's books. They are claiming that for the last three decades they have been operating at a loss. If we just look at the economic realities, we don't think the owner of these entities would allow that to happen unless, in reality, the petitioner was generating substantial value. So, Justice Thomas, here's how I would address the issue with this type of case. I don't have a position on whether the arguments have been preserved. We do think it's important to save this type of argument for the next case. When we have a situation like the one here where you have closely held affiliates, it's not clear what's happening. It looks like the defendant might be hiding its books, the economic reality in its books. We would ask, what would the defendants have charged unaffiliated entities for the same services if they were negotiating rates at arm's length? And we think there are two important insights that you might get from that type of analysis, and this gets to why we think that the court should vacate or at least shouldn't affirm the award as it stands right now. The first insight is we think if you do that type of analysis, we would see that the petitioner would have gained more money than the losses that they claim to have incurred over the last 30 years. But the second insight is we think if you have an entity that owns land like the affiliates here but doesn't have management expertise in how to rent out its property, and then you have a management company like petitioner that doesn't own land but does have the expertise, they would come to the negotiating table, both bring something indispensable that the other one doesn't have, that is, land if you're the landowner, expertise if you're the management company, and then they would negotiate the rates. But we don't think in that circumstance, and this is the error that we perceive in the decisions below, we don't think the economically realistic transaction would mean that the landowner would say the management company should keep all $43 million worth of profit that's generated through that enterprise. Counsel, you say that the United States takes no position on whether some of these arguments, which it seems you regard as important, were preserved. There have been a lot of times when the United States has taken positions on whether arguments have been preserved, and I'm wondering if you can elucidate for us why you don't take any such position in this case. In this case, it seems like this is something that the lower courts would be particularly well-suited to sort out. We think on top of the fact that it's not entirely clear which arguments the courts were grappling with below, we take the petitioner and the respondent to be arguing over what the courts actually did below. So when you have that type of confusion, I think it would be fair to say this court can follow its usual practice. Rather than reaching out and addressing whether arguments had been preserved, you can send the case back and let the courts... Well, no, that's the argument why you may not take that position or a position, but you tell us that you're not taking any position on that question. Well, I do want to emphasize I don't mean to speak for a respondent in terms of the arguments that they have made. Again, we don't think it's necessary for this court to decide whether the arguments have been preserved in terms of the outcome of this case. We do think there was an independent error in the profits award that was granted in this case. We think that there are other potential avenues that could have been pursued, may have been pursued, to get at the same number or a similar number on remand. Again, for purposes of the question presented before this court, we don't think you have to get into that. I actually take the arguments from both sides to vehemently agree on the answer to the QP itself, that is, whether you can order a defendant to discourse the profits of a non-party separate entity. I think everyone says the answer to that question is no. Then the question becomes, how do we calculate what the proper amount of profits should be when we are respecting corporate separateness? And we've identified background equitable principles that target that exact problem when it looks like what's shown on the defendant's books, which Petitioner conceded today in a reply brief, page 5, aren't controlling. There are various tools available to the court to sort out that type of problem, both in equity generally and in the trademark context. Well, if the judgment at issue cannot be sustained on the ground that was adopted by the Court of Appeals, why would we go further and say, but there's this other theory that might have provided a basis for some relief, and we don't know whether it was preserved, but we're just going to tell you about this theory and send the case back for the court to decide whether to apply the theory in this particular case. Why should we do that? Justice Alito, I want to lay down the marker again. We haven't taken the position, but I do understand Respondent to be arguing that they at least have not forfeited some of the arguments that we've raised in our brief. So, again, we would leave it to the courts below to determine what has been properly preserved, because I take it that the parties do have a dispute over what's actually still alive in the case. Well, we can leave it to the court below to decide what was and was not preserved, but why should we take the additional step of saying, here is a valid argument that you may want to consider if, in fact, you find that it was preserved? Justice Alito, if you think that is untoward, I think we would be happy with an opinion that answers the question presented and then makes clear that you were not foreclosing the other arguments that might be appropriate under the right factual circumstances and subject-to-party presentation principles. I think we could live with that. Our modest submission here is, whatever the court says in the opinion, it should not reach out and foreclose the other background equitable principles and arguments that we've identified in our brief. I think that would be the part that we would care about. But when you say not foreclose, just to follow up on Justice Alito's question, it seems to me I read, and the respondent can say if he sees it differently, I read there to be vehement agreements on the QP, the narrow QP2 as well. So why wouldn't the government be satisfied with our just answering the QP? It seems to me that that could be a pretty short opinion, and then just leaving it to the lower court, and they can make these arguments in the lower court, and we didn't grant cert on these other questions, which were not vetted below because the Fourth Circuit took a different view. I guess I don't understand why. As long as we don't go further and say this is foreclosed, doesn't silence on that point suggest that it's not? I think that would be fair. I also think that courts below might appreciate clarity in the court just saying we are not deciding the issue, but I wouldn't deign to tell you, Justice Barrett, how to write the opinion. I think the same outcome would come out the same way. It would cash out the same either way. Mr. Hunger, I guess I don't understand why the answer, the sort of way to handle a situation like this is just to pierce the veil. I mean, you say that the defendant is disguising its profits, that it's hiding economic realities, it's working with these other companies in a way that they're really operating in the marketplace as almost one entity. Why wouldn't the legally responsible way to deal with this, given the way the law has developed, to say that in order to do this, to consider the profits of the other entities to be the profits of the defendant, the court should have pierced the veil in this situation? Justice Jackson, I have four answers. If I may, I would like to lump into that the question why couldn't they have just sued the entities under the Lanham Act directly? And I think all four will get to that. The first problem is you might not get jurisdiction over the other entities. Now, I take the point that all of the entities, as I understand it, are domestic. But you can imagine a circumstance where one company decides it's going to restructure its affairs so it commits all of the infringement. Other entities incorporated overseas are going to collect all of the money. That, I think, would be a significant barrier. It might not be a barrier in this case, but in the next one that comes along, I think it would be. The second problem, the affiliates, if we're looking at substantive liability under the Lanham Act, this is my addition to the question, they might not be liable if you were to sue them. And there are a couple reasons why. If we're looking at direct infringement, there might be a problem under the facts of this case or a similar one. If one entity is doing all the infringing, that is, using the mark in commerce, is the one that created the consumer confusion, and the other entities, all they're doing is holding the money, just holding the proceeds or the profits of infringement is usually, I don't think, going to get you to substantive liability. And I think that might also be true if we're talking about secondary liability. This court explained in inward laboratories there are a couple of different ways you could get secondary liability if somebody is inducing someone else to infringe or if you provide your goods and services to somebody you know or have reason to believe is going to infringe, secondary liability can attach. On the facts of this case, I'm not sure if that would be a viable theory. I can imagine cases moving forward where it wouldn't be. So just before you go on, how many of your four things did you just get out? Two. I have two more, Mr. Chief. I will allow a historically unprecedented exception to allow you to give us the other two promptly. I appreciate it. The third point is alter ego. Veil piercing might not be available. Usually, the way I understand that works is you have an owner being held responsible for the conduct of its company. What I understand to be the case here is all of the entities are horizontal. That is, they don't own shares in each other, so veil piercing might be a problem. The fourth thing is we think the risk of disguising profits or manipulating your books is especially acute when you have all these entities that are closely held under common control. It's really tough to sort out what's actually happening on the ground, and veil piercing or substantive liability might not get at that problem. Thank you, Justice. Thank you, Mr. Chief Justice. Justice Alito? You begin to explain the theory that you think might be applicable or that would be valid by saying that the court can go beyond the defendant's profits when that is justified by the economic realities of the transaction. That seems awfully open-ended. I would tweak it a little bit, and then I hope provide a palliative, Justice Alito. So I would tweak it to say we're not going beyond the profits or the actual economic gain of the defendant. We're trying to train on what was the actual economic gain of the defendant. In terms of whether this is freewheeling or open-ended, I don't think so. This is something courts have dealt with in the equitable context dealing with profits awards. This court explained in cases like City of Elizabeth, that was one of the principal citations that the petitioner relied on, and in Goodyear, when a defendant is trying to lower its profits liability by asserting certain costs that it incurred, the court can peek under the hood and say, in terms of economic realities, that's not what actually happened here. In City of Elizabeth, there were claimed salary expenditures. The court said, no, those were gratuities. The defendant has to answer for them. They are part of their profits. In Goodyear, it was a salary payment that was claimed by the defendant. The court said, no, it was actually a distribution of profits. Those were patent cases, but courts of appeals have taken this court's lead in applying the same principles in the trademark context. That's the Aladdin decision, pre-Lanham Act, American Rice, Fifth Circuit, post-Lanham Act. Thank you. Justice O'Leary? Justice Kagan? You heard the colloquy between me and Mr. Hungar about the just sums provision. What do you make of that? What do you think it's there for? What do you think it allows? The first thing I will say is, I think I heard petitioner agree that that provision allows the full measure of compensation to the plaintiff. We agree with that. I took that to be what Mr. Hungar said, too, that there's sometimes a delta between what you arrive at through the profits calculation and what you understand to be the full measure of compensation for the plaintiff, and this allows you to close that. And I would say two things. I think to the extent the petitioner is arguing that this is really just a proxy for the compensation that the plaintiff lost, we think the better proxy here would be our theory, that is, what would the defendant have charged at arm's length in providing services to unaffiliated entities? The other thing I would say is, I take the point that the court might think what's happening here is not exactly strictly profits in the sense of sales minus cost, but we do think the just sum provision can address this type of situation. So just to spin this out a little bit, Mr. Chief Justice, I will be quick. The thing I think that you could look at is you could say, imagine the petitioner had contracted with its affiliates for a $10 million payout, and at the last minute at the end of the contract performance it decides, I'm going to forgive that sum, let's just leave it with the affiliates. I don't think we would be having a debate whether that was the profits of the defendant. That's classic anticipatory assignment. I take the point here that the petitioner, at least on these facts as I understand them, appears to have collapsed those two steps instead of contracting for an amount and then forgiving it, has just said on the front end in this contractual negotiation, we're going to take the low market rates and leave the rest with the affiliates. Economically, we think that is the same outcome, and we think those two cases should be treated similarly. And we think the just sum provision provides the courts a tool to do that. Justice Gorsuch? Justice Kavanaugh? Justice Jackson? Thank you, counsel. Mr. Lynn? Mr. Chief Justice, and may it please the Court, the legal question governing this case is really an evidentiary one. May a court awarding a profits-type remedy under Section 1117A ever take into account the finances of an affiliate of the defendant-infringer without piercing the veil? The answer is yes. The plain text authorizes it. And also, just relying on the financials of another party does not automatically disregard corporate separateness and require piercing the veil. Start with separateness. Disregarding corporate separateness is not an end in itself, but a path or a means to an end. So if a court relied on an affiliate's financials based on the conclusion that the affiliate is one and the same with the defendant, that would disregard corporate separateness. But it would not disregard separateness to rely on such evidence based on some other justification. Doing that simply recognizes, as has long been held, that legally separate entities, whether affiliates or not, can still interact in ways that bear on each other. Indeed, that is what the Fourth Circuit concluded happened here. It understood the district court not to have set aside separateness, but rather to have relied on the affiliate's revenues as evidence of petitioner's own, and I quote, true financial gain. And that tracks the record, which reflects that despite some imprecise language, the district court did not view the affiliates and the petitioner as interchangeable. To the contrary, and these facts are important, the district court relied on the affiliate's profits because it found that petitioner alone had generated all those revenues through its infringing activities. And so the revenues were thus again created by the petitioner, even though petitioner assigned them elsewhere. The other question is what part of 1117A authorized the district court to rely on this evidence. We believe the discretion to look beyond the defendant's net profits is found in the unique just sum provision. The U.S. reads the statute differently, but under either approach you get to the same place. I welcome the Court's questions. Mr. Lynn, we would not be here on this if your petitioner or respondent had sued all of the entities. Why wasn't that the approach? Your Honor, I understand that there were a number of practical and strategic reasons, but I think maybe the easiest answer to you is, Your Honor, if you look at JA 109, which is in the expert report, it notes that the petitioner's website represented that it owned $1.5 billion in properties. We didn't know, in short, that there were other ownership entities. And so we made the decision to sue who we thought was the defendant, and we think that the just sum provision allows us to get at the defendant's true financial gain. So I guess to some extent you have to argue that the just sum provision allows you to pierce the corporate veil. This would be a different case if it were a partnership or sole proprietorship. Your argument would be much easier. So how do you get past the separate corporate entities? Even to calculate income, it's not the income, technically, of the petitioner here. Your Honor, so my answer to you is, I would take issue with the premise that we have to argue that the just sum provision requires piercing the veil, and it gets to what I think is an important understanding of what disregarding the corporate separateness really means. I think it's a means to a certain outcome, and so really the justification for looking at the affiliates' financials matters. This Court has said, and if I could, the Arthur Anderson case, Arthur Anderson v. Carlyle, the 2009 case, is talking about, you know, when you can hold nonparties to a contract to be responsible. And it lists a number of ways to do that. Assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver, and estoppel. And, Your Honor, my point is, piercing the corporate veil and disregarding corporate separateness is one way to look at the affiliates' finances. But there are other ways, and if the reason is not simply that you're concluding that the two are indistinguishable, then you're not disregarding the corporate veil at all, and there's no reason to say that the just sum provision allows piercing the veil. We're simply saying, if you look at the findings of fact here, which are unchallenged in this Court, what the Court concluded, it's somewhat of an unusual factual finding because they're unusual facts, but what the Court concluded is that the petitioner alone drove and created all of these revenues and then put them on the books of the affiliate. That is not disregarding corporate separateness. Yes, Your Honor, I'm sorry. I'd agree with you that there are many ways to skin the cat. You can sue these people. You can pierce the veil. You've got all kinds of equitable theories. You just had a great list of them a second ago. But as I understand it, the Fourth Circuit below did none of those things. And you all actually agree with that, and you agree that on the question presented, the Fourth Circuit erred. Is that right? No, Your Honor. So Solicitor General's wrong. There isn't total agreement here today. There is total... If I could answer that two ways. And pick one. Maybe I can combine them into one answer. Give me your best. There is total agreement that you cannot include in the judgment the affiliate's profits as the affiliate's profits. As such, yes. Right? Because that would be saying... We need some other theory to get that. You need some other reason, unless you're going to pierce the veil. Right. And we would say that that other reason exists here. Okay, but that didn't happen below. That's not on which the judgment rests in the Fourth Circuit. And so perhaps maybe you preserve the arguments. Maybe you didn't. The Solicitor General doesn't know. And maybe the best thing in those circumstances is for us to vacate for a man and allow you to try again. And so what I would quarrel with, Your Honor, is that there was no other reason on which the judgment below was based. I think if you look at Petitioner's Appendix 43A, what the Fourth Circuit says is, We view the district court's decision differently. Rather than pierce the corporate veil, rather than disregard corporate separateness, the court considered the revenues of entities under common ownership with Dewberry Group in calculating Dewberry Group's true financial gain. And that's a quote that Petitioner assiduously leaves out of any of their pleadings. What the Fourth Circuit's basis was was that it did not understand the district court to have just viewed the two, the affiliates and the defendant, as a single entity. I think what Mr. Hungar would say to you is, that's a nice little snippet, but there's no work there. It appears that the court just treated the affiliates' profits as the defendants' profits, pretty much full stop. And that that's a mistake. And I think you'd agree with that, that something more needs to be done to attribute those profits to the defendant. Some work has to be done under some equitable theory. And we don't have any evidence that the Fourth Circuit did that. In this case, maybe they can. Maybe you have the facts. You have lots of theories to work with. But we don't know. Two answers. One, just... Well, one... Well, I have to take issue with the fact that there has to be an equitable theory. We think that just some provisions provide the statutory basis. Sure, throw that in the pot, too. And yes, I agree that there has to be more work as a general matter. But I think that work was... So, yes, the Fourth Circuit's analysis is very short. But I think what the Fourth Circuit's analysis tracks is its understanding of the full record. And I think if you go to the record, and that's what I was alluding to earlier, and you look at the unchallenged findings of fact in this case, the unchallenged finding of fact in this case is that the defendant petitioner created all of the revenues that the affiliates... And this gets to Justice Jackson's question. The affiliates were passive receivers. They had no employees. They did not do a single thing. Now, they suggest in their briefs that that is wrong, but that is the unchallenged finding of fact of the district court, which you are stuck with here. But, Mr. Lin, I guess, kind of to follow up on what Justice Gorsuch is saying is, you know, at a minimum, can we agree that the Fourth Circuit's opinion isn't a model of clarity on this point? I think we can agree on that. So if we want to go beyond just the strict QP in the way that we've talked about, the point in which there's vehement agreement, we have to articulate some theory, correct, to justify the Fourth Circuit's opinion. You're giving us some mechanism for doing that, but the Fourth Circuit didn't spell that reasoning out. It sounds like you're pretty confident in your position, and Justice Gorsuch said you have a bunch of theories. If the Fourth Circuit believed that, it can presumably make pretty quick work of this on remand, and then maybe you walk away and you win quickly. But we would be kind of wading into uncertainty if we spell out all of those theories that the Fourth Circuit never addressed. I understand the question, Your Honor, and here's how I'd respond to that. I think if you conclude, a majority of this Court concludes, that you're uncertain about what the Fourth Circuit did, whether the record supports the idea that there was no disregard of corporate separateness, then I do think that you should vacate and remand and allow the lower courts to spell out what they did and whether that was permissible. But I think, Your Honor, if you agree with us that the record is clear on its face, and we think that the record... I think if you look at the unchallenged factual findings, I don't think there's another way to read the record, and I think if that's true, then you do have to go on and address the other questions. So you would say, like, it's just kind of a quibble between a vacate... If we have uncertainty about the Fourth Circuit opinion, you're just trying to make sure we vacate and remand and not reverse? Is that kind of... Well, yes, Your Honor. I mean, I don't think that this Court should reach out and decide what the amount of the judgment should be, which I think is what you would have to decide if you were to just straight-up reverse and not allow any further proceedings below. I think if you have uncertainty as to what the courts below did, then I think the answer is you could decide the QP. I think you could provide some further guidance to Justice Jackson's question. I think I would say it's not categorically impermissible to look at the financial evidence of affiliates and then allow this to go back down and for the courts to further explain what they did and why that was not... It's like a scope of the remand question, kind of what we say about that. When I read the petitioner's brief, and not until the reply, he seemed to be saying, and I think that he's disavowed that now. If you disagree, let me know, that you looked only at the defendant's tax returns, basically. And I think he's now disavowed that theory and admitted that you can look at the revenues of an affiliate in some circumstances. Correct? Yes, Your Honor. I read the brief the same way, and we understood them to be arguing below as well, that the tax returns are what provide the measure of their profits. I do think that in the reply in today, my friend is saying that there are circumstances where you could not only look beyond the tax returns to receipts maybe that are not recorded, but also potentially to the... You said something earlier was that Dewberry Group had basically taken the revenues of the affiliate. But actually, if this is a horizontal situation, Dewberry Group had no power to order the affiliates to do anything. Correct? Yes, Your Honor. And if that's what I said, let me clarify what I said. I thought that's what you said, and that's the complication in this case, which is what Mr. Crown pointed to, that this is a horizontal situation where it's really the owner, John Dewberry, that could order anybody to do anything. Correct? And he's not a defendant here. I don't think that's what, again, I don't think that's what the factual findings reflect. And if I could, Your Honor, I think there's three sort of key factual findings, and I can point you to where they are in the record. The first is that the district court held, and so it's not that Dewberry Group took the revenues, but the district court held is that the district court generated all of the revenues, that the affiliates added no value, did no work, that the revenues and the gain was created by the petitioner, and that's at Petitioner Appendix 83A, where it not only held that but rejected, and my friend said today, that there was no testing of whether the affiliates had contributed any value. At Petitioner Appendix 83A, the district court rejects the petitioner's argument that, quote, it is not the economic engine that creates the revenue. They had argued that the affiliates, through their ownership of the property, had somehow added some value, and the district court specifically rejected that. So finding fact number one, unchallenged. The petitioner generated all the revenue. The second is that the petitioner controlled the allocation of the revenues. That's at 83A, where the district court says that the petitioner was responsible for the accounting and cash management, and it adopted Dewberry's expert, who said in the testimony at JA-68 that petitioner's, quote, management determines whether, on paper, petitioner or the affiliates show the losses or the profits. So we have the finding that they drove the revenues, created the revenues. We have the finding that they controlled where the revenues are recorded. And then third, the third finding is also at 83A, that petitioner's tax returns don't tell the whole story, and that all revenues generated through Dewberry Group show up on the ownership entities' books. So I think if you look at those three, what you have is, again, admittedly some unusual factual findings, but they're supported by the record, and they're not challenged. Dewberry Group, the defendant, created all the revenues. Dewberry Group, the defendant, decided where they were recorded, and Dewberry Group, the defendant, had them recorded on the ownership entities' books. So what you have is not the idea that they are indistinguishable, the petitioner and the affiliates. To the contrary, it's a recognition that they are separate entities and that only one of them drove and created the gain. And the just sum provision allows for a district court to look and say, look, I think the net profits are inadequate. I'm going to look for the true gain. I have to do it in a way that doesn't disregard corporate separateness, and I've done that here. Wouldn't the way to do that, though, is to recognize the two steps in the statute? So to the extent we're looking only at Dewberry Group, shouldn't the court have said zero, which is what they said, and then we move to the second step using the just provision and adjust it in the way that you're talking about? I think it did do that. Again, I think if you look at... If I can remember where. I think if you look at... I think it's 83A as well. What the district court says is 84A. Dewberry Group's tax returns standing alone do not tell the whole economic story. I think that's step one. I think they were presenting... I'm sorry. The district court was presented with the notion that the profits are zero based on the tax returns, and the district court said that doesn't tell the whole economic story. I think that's enough of a finding to support a finding of inadequacy under step one. You then go to the just sum provision, and the district court says, what are the true gains? And again, I can't... You can't disregard corporate separateness. You can't simply say they are indistinguishable entities, but if there's evidence that the true gains are a certain amount, I can look at the financial records and determine that. And here, again, the unchallenged factual finding is that the petitioner created all of the revenues. This case might seem a little bit less unusual, to be honest, if the finding were that the petitioner created half the revenues, right? 25% of the revenues. Then we would have a much smaller just sum judgment, and I don't think anybody would be saying, wow, this number looks a lot like the full amount of the profits. But the reason that we have what kind of appears like an unusual outcome is because we have unusual facts and an unusual factual finding. On the just sum provision, Justice Kagan, you had asked, what does that encompass? And we had understood, our friends have argued that you can't go beyond net profits, that the just sum provision is only about a situation we can't figure out, the net profits. I think I heard my friend say today that you can, that there could be a delta between net profits and gains, and that the just sum provision could allow a court to get at that. And I think that's the only way that the just sum provision can be squared with its text. Because the text specifically says that if a district court finds inadequate or excessive the amount of an award of profits, it can award a sum that is just. And I think textually what that means is the just sum provision is about providing for an award that goes beyond profits. I think Mr. Hungar might say, well, there was an important qualification in what I said, which is that you can't do this in a way that treats the defendant just the same as these other corporate entities, and that that is an important limit in this case at any rate. Understood. And we would agree with that. We don't think that you can use the just sum provision in a way that simply treats the entities as indistinguishable, and that is why, to answer Justice Thomas's question, we don't have to show that the just sum provision would permit disregarding corporate separateness. But again, I think our point here is that we don't think the district court, when you look at the record, in fact ignored corporate separateness in using the just sum provision. Could you take just a moment to address the SG's argument that the courts below offered no persuasive justification for awarding all of the revenues that petitioners' affiliates received? Of course, Your Honor. There's two answers to that, and the first one comes back to the factual finding. The factual finding is that the petitioner and the petitioner alone created all of the revenues and then put those revenues on the books of the affiliates. So, number one, I think the factual finding says that all of those revenues, and therefore all of the profits, are the true gain of the defendant. The second answer is, to the extent that there is any uncertainty or a quarrel about whether some portion of that number is not attributable to the infringement or should have been reduced by costs, the burden for that, whether statutorily at what I would call step one or equitably under the just sum provision because of the word just, the burden for that disentanglement falls on the defendant. That goes all the way back to the Westinghouse case and the doctrine of trustee ex maleficio, where once we have shown, basically made a prima facie showing of what the gain from the infringement is, which I think is supported by the factual finding, then the burden of disentangling anything that we might not be entitled to, that falls on the trustee. That's the doctrine of accounting of profits. And they, again, as the district court and the Fourth Circuit recognized, they refused to engage with that because they simply said, we don't think any of these affiliate profits have any relevance whatsoever to what our true gain is. And so that risk falls on the defendant. Thank you, counsel. Justice Thomas, any further? Would it matter in our consideration of whether or not the affiliate income should be counted that the affiliates, that this practice is typical or atypical in the real estate industry or whether the tax assessed by, say, the IRS reflects your thinking or that of Mr. Hungar? In other words, that the affiliates pay separate tax or that this is typical practice in the real estate industry to keep the businesses separate? Your Honor, I think the short answer to your question is I don't think it should particularly matter. I think the question here is whether, you know, who drove the revenues. And, I mean, you can have separate entities where maybe the affiliates are doing more work in a different case than in this case. And, again, that gets back to my explanation before about why this judgment might look a little bit unusual, but that's because the facts here were that this petitioner drove and created all of the revenues and then put those revenues on the books of the affiliate. Justice Alito? Justice Sotomayor? Justice Kavanaugh? Justice Jackson? Would piercing have been an option here for the court from your perspective? The SG said it came up with a number of reasons why piercing wouldn't have resolved this issue. Your Honor, I think you may appreciate that I'm hesitant to commit one way or the other. I don't want to prejudge whether piercing could be shown or not. Our position was that we didn't have to do it and that the just sum provision would amount for it. I think if this were to go back and there was a contention, if the Fourth Circuit concluded or the district court that the just sum provision couldn't be used in this way, we would then address that question. Thank you. Thank you, counsel. Thank you, Your Honor. Rebuttal, Mr. Hungard? Thank you, Your Honor. So, with respect to the argument that petitioner generated the profits, as a matter of law, the fact that a corporation, through its employees, agents, or independent contractors, as here, uses other people to generate its profits does not mean that those service providers own the profits so generated. This court held precisely that, even in the tax context, in permission or against banks, at the government's urging. The argument there was that the lawyer who generated the proceeds of the lawsuit, who did all the work to make that lawsuit profitable, was the owner of the income that was shared, that had been assigned to him, and the court said, no. The owner of the property, the cause of action, owns the proceeds of that property, the settlement award, and the fact that the lawyer did all the work doesn't mean that he's the owner or the recipient of the income. That's why the taxpayer, the owner of the claim, had to pay taxes on the full amount. Precisely the same is true here, and for every corporation. Every corporation generates its profits through the work of agents or independent contractors, but that doesn't mean that the independent contractors own the profits. The affiliates own the property. They are the lessors. They receive and are legally entitled to the rents, so you can't treat those rents received by the affiliates on property that they own as if those rental proceeds were owned by a petitioner without disregarding the corporate form on one of the many grounds that one could have done that. I think the problem is they didn't do that here, so the argument about who generated the profits proves nothing, and this Court's decision in Banks and Bollinger established precisely that. So with respect to the question whether there's vehement agreement, I think you heard Respondent vehemently disagree with our position. They say that courts can do what the Court of Appeals did here, and again, there is no doubt. There is no doubt that what the courts below accepted and what Respondent argued below was not what they're arguing now, but rather, pay no attention to the corporate form. We don't have to pierce the corporate veil, but these are all owned by the same guy, and they're all involved in an interrelated enterprise, and therefore, we should treat all the profits of this collective economic enterprise, as their experts said at page... sorry, single economic enterprise at page 146, 149, and 218 of the Joint Appendix. They argued collective economic enterprise in their proposed findings, 319, 322, 325, and so forth. The district court found that it would treat petitioner and its affiliates as a single corporate entity. The Court of Appeals did the same thing, single corporate entity. That is disregard of corporate separateness, plain and simple. That is the only theory that was argued below. It's the only theory that was accepted by the courts below, and Respondent is trying to run away from it and pretend that they don't want to treat the affiliates and petitioner as interchangeable. Those were his words today, but that's precisely what they argued below and persuaded the courts below to accept, and that's precisely what this court should reject. And it should reject it not only as to the principles of equity and based on the language defendants profits in the statute, but it should also reject the just sum argument for precisely the same reasons, because just sum is subject to the same equitable constraints and can't impose a penalty, and for precisely the same reasons, therefore, and it's also subject to the best foods presumption, which requires Congress to speak clearly to override corporate separateness, which it didn't do. So for all those reasons, the court should reverse as to the rationale adopted by the Court of Appeals and reject the just sum argument that Respondent is offering in an attempt to defend that illicit rationale. And there is no need for a remand, again, because this is not a question of whether it was, it's not only a question of whether it was failed, they failed to raise any of these arguments below. They failed to raise them in the brief in opposition and they failed to dispute the assertion the petitioner had zero profits from the infringement. So as a matter of Rule 15, which this court has a responsibility and the authority to enforce, not the Court of Appeals, as a matter of Rule 15, those issues are not in the case, so there's nothing to remand. For all these reasons, we ask that the judgment of the Court of Appeals be reversed full stop. Thank you, Counsel. The case is submitted.